(846 P.2d 944)

No. 67,312

IN THE MATTER OF THE MARRIAGE OF AILLEEN M. CRAY, *Appellant/Cross-Appellee*, and THOMAS M. CRAY, *Appellee/Cross-Appellant*.

Opinion filed
February 12, 1993.

*Stephen J. Blaylock* and *Cindy L. Cleous,* of Woodard, Blaylock, Hernandez, Pilgreen & Roth, of Wichita, for appellant.

*Jake W. Brooks,* of Scott City, for appellee.

Before ELLIOTT, P.J., DAVIS J., and C. FRED LORENTZ, District Judge, assigned.

LORENTZ, J.: This is an appeal by Ailleen M. Cray from the final decision in a divorce action wherein property values were determined using the date of separation, appellant was not awarded profits and/or losses from appellee's pension plan, and orders were entered regarding child support. Thomas M. Cray cross-appeals from orders regarding maintenance, assessment of litigation expenses against marital residence equity, and modification of a portion of his settlement proposal.

The parties were married August 19, 1970, in Davenport, Iowa. Although two children were born of the marriage, at the time of trial, only Tommy Michael Cray, age 12, remained a minor.

A review of the record reveals that Ailleen left the marital home and relationship on December 31, 1987. At that time, she took only her clothing and left the children with Thomas. By agreement of the parties, she had rarely worked outside the home.

In August of 1988, Ailleen filed an action for separate maintenance, which was later amended to an action for divorce. That divorce action was voluntarily dismissed in February 1990 by Ailleen because she was not ready for trial. Shortly thereafter, in April 1990, she refiled this present action for divorce, alleging the grounds of incompatibility.

The divorce was bitterly contested by both sides, with over 1,000 items of property and debt, ranging from the trivial (silver

dust cloth worth 10 cents) to the substantial (marital residence worth $87,000), being brought before the trial court for division. The child custody issue had previously been settled between the parties, with Ailleen designated the residential parent in a joint custody arrangement. The parties had contested the date of valuation of marital assets at trial, with the court finding from the trial testimony that the parties had essentially gone their separate ways from December 31, 1987, and that date was then used by the court in determining asset valuation.

The trial court declared the parties divorced at the end of the trial but took the issues regarding property and debt division under advisement. The trial court issued its memorandum decision on January 22, 1991, regarding the issues taken under advisement, set out the orders of the court, and directed Thomas' attorney to draft the journal entry of divorce. Thereafter, numerous motions were filed by the parties and ruled upon, with the final journal entry being filed on July 22, 1991. On October 9, 1991, motions by the parties for the trial court to reconsider, alter, or amend the judgment were denied.

Ailleen first contends the trial court's adoption of the original date of separation (December 31, 1987) as the date of valuation for the marital assets, specifically Thomas' retirement plans, was error and contrary to the laws of the State of Kansas. Thomas, on the other hand, argues that Kansas law does not fix a particular date of valuation, leaving such date to the trial court's discretion. He asserts that under Kansas law, the division of property need only be just and reasonable, taking into consideration the factors listed within K.S.A. 1991 Supp. 60-1610(b).

This issue was recently discussed in *In re Marriage of Schwien*, 17 Kan. App. 2d 498, Syl. ¶ 3, 839 P.2d 541 (1992), where it was held:

"The trial court has discretion to value the marital estate at the time of separation, at the time the divorce petition is filed, at the time of the divorce hearing, or as the facts in each case dictate. When the time of valuation becomes an issue in a contested case, the trial court at the pretrial conference should set the valuation date."

In *Schwien*, the husband valued all the marital property as of the date the parties separated. The wife valued the farming partnership as of the date the petition for divorce was filed and the

remainder of the marital assets as of the date of trial. Because no consistent valuation date was used at trial regarding the value of all the marital property, the trial court's decision was reversed and the case remanded for retrial using a consistent date of valuation.

The real issue before this court is whether a trial court can value assets, particularly retirement plans, at a time substantially earlier than when a divorce action commences. In this case, the court adopted December 31, 1987, as the valuation date even though Ailleen did not file for separate maintenance until August 1988. That original action was dismissed in February 1990. Ailleen filed again for divorce in April of 1990, and this action came to trial in November of 1990. Ailleen valued the retirement plans as of June 30, 1990. They had increased substantially in value since Thomas' valuation dates of September 30 and December 31, 1987.

We believe the trial court's adoption of the December 1987 values for the retirement plans was error and contrary to the laws of the State of Kansas.

We decline to apply the holding of the Court of Appeals panel in *Schwien,* 17 Kan. App. 2d 498, Syl. ¶ 3. Under the facts of this case, we hold the trial court should use the date of the filing of the divorce petition as the date for valuing marital property, with the discretion to consider the length of the parties' separation in dividing that marital property.

Kansas case law has long recognized that property acquired after separation but before divorce was property acquired by the parties jointly during their marriage for which a court can make a division in a divorce action. See *Forrey v. Forrey,* 167 Kan. 77, 204 P.2d 725 (1949).

We can also look for guidance to Kansas statutory law as found in K.S.A. 23-201(b), which defines marital property:

"(b) All property owned by married persons, including the *present value of any vested or unvested military retirement pay,* whether described in subsection (a) or acquired by either spouse after marriage, and whether held individually or by the spouses in some form of co-ownership, such as joint tenancy or tenancy in common, *shall become marital property at the time of commencement by one spouse against the other of an action in which a final decree is entered for divorce, separate maintenance or annulment.* Each spouse has a common ownership in marital property which vests at

*the time of commencement of such action,* the extent of the vested interest to be determined and finalized by the court pursuant to K.S.A. 60-1610 and the amendments thereto." (Emphasis added.)

The above definition is in line with Kansas case law. In *Cady v. Cady,* 224 Kan. 339, 344, 581 P.2d 358 (1978), the Kansas Supreme Court found that the filing of a divorce creates a species of common or co-owned property with each spouse becoming an owner of a vested, but undetermined, interest in all property individually or jointly held by the parties.

In the case before us, the only court proceeding which ended in a journal entry of divorce was the action filed by Ailleen in April of 1990. Accordingly, that date fixed the extent of the marital property of the parties. It would be illogical to then value the property at a time other than when it became marital property, as that would be tantamount to altering the extent of the marital property as defined by statute.

Notwithstanding that logic dictates valuation should be determined on or as close as practical to the date the extent of the marital property is determined, the trial court may still consider any factor, including such things as length of separation, diminution of value, unnecessary delay, or any number of other factors, specifically listed or not, that, in the trial court's discretion, are necessary to consider in making a division of property pursuant to K.S.A. 1991 Supp. 60-1610(b). The pertinent language of that section provides:

"In making the division of property, the court shall consider the age of the parties; the duration of the marriage; the property owned by the parties; their present and future earning capacities; the time, source and manner of acquisition of property; family ties and obligations; the allowance of maintenance or lack thereof; dissipation of assets; *and such other factors as the court considers necessary to make a just and reasonable division of property.*" (Emphasis added.)

Accordingly, fixing a valuation date does not prevent the trial court from taking into consideration changes in value from that date, if circumstances warrant this, in determining what, in a given case, would be a just and reasonable division of property. On the other hand, fixing a valuation date would lead to more consistency among trial courts in determining value from case to

case while at the same time leaving them with discretion to make just and reasonable property divisions.

The foregoing reasoning would also apply to valuation of pensions using the analysis set out in *In re Marriage of Harrison*, 13 Kan. App. 2d 313, 769 P.2d 678 (1989). In that case, concerning military pensions, the court pointed out the fact that K.S.A. 23-201(b) had been amended to provide that marital property includes "the present value of any vested or unvested military retirement pay." We can see no reason why any other vested or unvested pension or retirement pay or plan should be treated any differently.

In *Harrison*, 13 Kan. App. 2d at 316, this court discussed two suggested, but not exclusive, methods of valuation of military pensions which offer guidance regarding valuation methodology of all pensions in general. Although those methods of valuation set out in *Harrison* are still valid, we note that in regard to the "present cash value method," this court referred to the present value being determined as of the time of divorce. In light of our previous analysis in the case currently before us, the time of divorce would no longer be the correct date for establishing value; the correct date would be the time of the filing of the action for divorce.

We therefore hold that present value of pensions, vested or unvested, military or nonmilitary, becomes marital property at the time of filing of an action for divorce, and we further hold that the valuation date of marital property, including pensions, in a divorce action, is at the time of filing of a petition for divorce which actually results in a divorce being granted.

Ailleen next contends the trial court erred in failing to award her profits and/or losses associated with her share of a qualified domestic relations order concerning Thomas' 401(k) plan up to the time of distribution of same and by failing to designate her as the surviving spouse until distribution of the 401(k) funds set aside to her under the qualified domestic relations order.

Counsel repeatedly refer to a qualified domestic relations order in their briefs. However, a review of the record does not disclose whether a qualified domestic relations order was ever prepared or approved by a pension plan administrator. The trial court has the power to order the parties to enter into a qualified domestic

relations order, which is a domestic relations order adhering to the requirements set out under 26 U.S.C. § 414(p)(2), (3) (1988) of the Tax Code and 29 U.S.C. § 1056(d)(3)(C), (D) (1988) of the Employment Retirement Income Security Act (ERISA). Such an order is not a *qualified* domestic relations order until it is approved by the plan administrator, and the plan administrator is not bound by an unapproved domestic relations order. 3 Valuation & Distribution of Marital Property § 45.27(2), p. 45-123 (1992); 26 U.S.C. § 414(p)(7)(C); 29 U.S.C. § 1056(d)(3)(H)(iii). Accordingly, this is not an appeal from a qualified domestic relations order, but will be treated for our purposes as an appeal from the trial court's order directing the parties to enter into a qualified domestic relations order setting aside certain funds to Ailleen from Thomas' 401(k) plan.

Ailleen argues it was error for the trial court to deny her request for a provision in the proposed qualified domestic relations order requiring that she get any profits or losses on her portion of the plan which accrue between the time of the divorce and the ultimate distribution or segregation of those funds. She further argues it was error for the trial court to refuse to designate her as the surviving spouse in the qualified domestic relations order because if Thomas dies before she does, the administrator would pay Thomas' benefits to his heirs or new spouse instead of her. Thomas counters by pointing out the court need not make such orders because the funds are automatically segregated when the trial court directs the issuance of the qualified domestic relations order and those segregated funds then receive their respective profits and losses.

The Retirement Equity Act (REA) and other federal legislation have significantly expanded property interests of a former spouse, *i.e.*, the nonemployed spouse, in the qualified plan benefits of the employed spouse. The burden is on the attorney for the nonemployed spouse to assure that the domestic relations order is drafted correctly. 3 Valuation & Distribution of Marital Property § 45.27[4]. See 3 Valuation & Distribution of Marital Property § 47.01.

Ailleen relies primarily on the Tax Code in making her arguments; however, both the Tax Code and ERISA apply.

"Before the enactment of the Employee Retirement Income Security Act of 1974 [29 U.S.C. § 1001 *et seq.* (1988)] the Internal Revenue Code was the primary statute regulating pension benefits. However, the taxing statutes proved inadequate to counter widespread abusive practice. In response, Congress enacted ERISA to better regulate qualified retirement plans and employee benefits.

"To facilitate the impact of this new legislation, ERISA was given preemption status under I.R.C. § 514 except for government plans, workman's compensation statutes, and other special concerns." 3 Valuation & Distribution of Marital Property § 47.02[1].

The journal entry directed that the sum of $21,059.77 be set aside to Ailleen from Thomas' 401(k) plan. Thomas' 401(k) plan is a defined contribution plan falling under the ERISA provisions.

Under both the ERISA provisions regarding the alienation or assignment of plan benefits, 29 U.S.C. § 1056(d)(3)(H), and 26 U.S.C. § 414(p)(7)(A) of the Tax Code, during the time the administrator is determining whether a domestic relations order is a qualified domestic relations order, "the plan administrator *shall* separately account for the amounts . . . *which would have been payable* to the alternate payee during such period if the order had been determined to be a qualified domestic relations order." (Emphasis added.)

We note the following:

"The first consideration regarding segregation is the timing of any distribution to the non-employed spouse. The non-employed spouse may receive nothing (assuming the employed spouse is alive and a plan participant) until the early retirement threshold conditions discussed earlier have been met. After the threshold retirement requirements have been attained by the employee, the non-employee's share of the funds may be segregated provided the issue of the validity of the [qualified domestic relations order] is being decided. The sum(s) to be segregated is limited to benefits currently payable. Other than in this specific set of circumstance, the Act does not appear to make any provision for segregation of [qualified domestic relations order]-apportioned assets.

"It should further be noted that when REA permits segregation of funds, it requires that they be placed in either of two places, a separate account in the plan or in an escrow account. The non-employee spouse is not a designated holder of funds during the time the [qualified domestic relations order] is being validated. For a [qualified domestic relations order] to provide for and/or a plan administrator to sanction, the transfer of assets directly to the non-employed spouse during this period, is contrary to specific Act

provisions." 3 Valuation & Distribution of Marital Property § 45.35[1], p. 45-189.

It would appear that where the proffered qualified domestic relations order requires segregation of the amount beyond the specified limits of the Tax Code or ERISA, it is likely the proffered qualified domestic relations order will be found defective, and the plan administrator may justifiably find the domestic relations order not qualified. 3 Valuation & Distribution of Marital Property § 45.35[1].

Based on the foregoing, we hold that a nonemployee spouse does not have a right to the funds from a pension made the subject of a qualified domestic relations order until two thresholds are met. First, time for payment of the funds to the employee spouse must accrue, and second, the funds are to be segregated while the issue of the validity of the qualified domestic relations order is being determined by the plan administrator. Until both requirements are met, neither the apportioned pension funds nor the profits and losses flowing therefrom are the property of the nonemployee spouse.

The Tax Code, at 26 U.S.C. § 414(p)(2)(B), and ERISA, at 29 U.S.C. § 1056(d)(3)(C)(ii), require that the trial court directing the entry of a qualified domestic relations order must state the amount or percentage of the participant's benefits to be paid to the alternate payee. Ordering a percentage of the benefits would logically give the alternate payee the benefit of any profit or loss sustained on the current value of the plan from the time of divorce to distribution of the benefits to the alternate payee. The decision to designate the amount given to the alternate payee is within the discretion of the trial court.

In the case before us, the trial court ordered that Ailleen receive $21,059.77 from Thomas' 401(k) plan to even out the property division. The record does not reflect an intent by the trial court to have Ailleen participate in profits and losses of the 401(k) plan. If that had been the desire, the trial court could easily have ordered that she be given a percentage of the plan benefits that would have grown or shrunk until the time of distribution to reflect any profits or losses attributable to her portion.

Because the trial court intended to even out the property distribution by a stated amount and not to provide a form of re-

tirement benefits for Ailleen, the trial court did not abuse its discretion in ordering a lump sum amount payable to Ailleen. The trial court's choice of a lump sum allotment meant that the plan administrator would not give her any profits and losses on that sum because, as we noted previously, she, as an alternate payee, has no right to segregation until the threshold requirements are met.

Ailleen next contends the trial court erred in refusing to order that she be designated as the surviving spouse for her award under the qualified domestic relations order, asserting that if Thomas dies, the plan administrator would pay the benefit to his heirs or a new spouse should he remarry. In her argument, she cites 26 U.S.C. § 414(p)(5)(A), (B), which mandates that a former spouse shall be treated as the surviving spouse for benefit purposes where a joint and survivor annuity is involved under 26 U.S.C. § 401(a)(11) (1988).

We again look to 3 Valuation & Distribution of Marital Property § 45.32[2], where it is stated:

"To allow the former spouse to be named as the survivor beneficiary prohibits the employed spouse from designating any future spouse as beneficiary. Regardless of subsequent events (other than the death of the former spouse) the employed spouse loses all control over the disposition of his pension benefits, should he die after making such election. This surrender of control starts with the insertion in the [qualified domestic relations order] of the survivor annuity election (normally while employed and possibly many years from a retirement point) and continues until the death of the employed spouse (such death may occur many years after actual retirement). It must be recognized that a court-ordered and [qualified domestic relations order]-mandated survivor annuity option election by the employed spouse will affect the *total* retirement benefit and not simply that portion of the entitlement(s) which represents marital property. This is so because, by its nature, the joint and survivor annuity is not a divisible benefit. To allow multiple survivors would require major changes in the actual annuity contract." (Emphasis in original.)

Only one case could be found dealing with this issue. Although not squarely on point, the recent case of *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114 (10th Cir. 1991), is a good example of what may happen where the trial court, intending to give the former spouse a specified amount, orders that spouse to be designated the beneficiary of that plan. In *Carland*, the trial court gave the former spouse the current face value of the employee's

life insurance policy which was covered by ERISA. 935 F.2d at 1116. Pursuant to the decree, benefits of the policy in the amount of its current value *at the time of divorce less $1,000.00, i.e.,* $13,000.00, was to go to the former wife. 935 F.2d at 1117. Complying with the decree, the employee sent a letter to the plan administrator attaching a schedule from the decree along with forms changing his beneficiary designations to make the former spouse the primary beneficiary of $13,000.00 (current value, less $1,000.00 as of the date of the divorce, September 4, 1964), and his present wife the beneficiary on all amounts "over and above $13,000.00." 935 F.2d at 1117. After the employee died, both the former spouse and present spouse filed for benefits under the policy. 935 F.2d at 1117. In resolving who should get the benefits, the court found that

"[b]ecause a divorce decree satisfying the statutory requirements becomes part of the record when a plan receives notice, a plan administrator complying with ERISA must take that decree into account in making a beneficiary determination.

. . . .

". . . ERISA requires specific information in a divorce decree for that decree to escape preemption and qualify as a beneficiary designation for an ERISA-governed plan. Based on the statutory requirements in section 1056, a plan administrator can determine with certainty whether language in a divorce decree affects the payment of benefits." 935 F.2d at 1121.

Where the plan administrator has notice of the decree satisfying the requirements of 29 U.S.C. § 1056(d)(3)(B)(i), "the administrator may not contravene Congress's intent by ignoring that decree in favor of other documents on file." 935 F.2d at 1122. In *Carland,* the court found the decree met the requirements of ERISA; contained language that the former spouse be the sole beneficiary of the "current value" of the plan; interpreted the meaning of "current value" as the value of the policy at the time of the employee's death; and held, therefore, that the former spouse receive all of the benefits under the policy, not just the value at the time of divorce, while the surviving spouse received nothing. 935 F.2d at 1120-22.

By ordering that the former spouse be designated on the policy as the surviving spouse, the trial court in *Carland* effectively nullified the provision of 26 U.S.C. § 414(p)(5), which provides:

*"To the extent provided in any qualified domestic relations order—*

"(A) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of sections 401(a)(11) and 417 (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes), and

"(B) if married for at least 1 year, the surviving former spouse shall be treated as meeting the requirements of [26 U.S.C. § ] 417(d) [1988]." (Emphasis added.)

See ERISA, 29 U.S.C. § 1055 (1988) and 29 U.S.C. § 1056(d)(3)(F)(i), (ii), for nearly identical provisions as those in the Tax Code.

It appears that ERISA and the Tax Code automatically provide that the former spouse be treated as the surviving spouse, *to the extent provided,* where a qualified order exists, making it unnecessary and even hazardous, as seen in the *Carland* case, for the trial court to specifically order that the former spouse be designated as the surviving spouse for purposes of the plan benefits. The trial court did not abuse its discretion in failing to order that Ailleen be designated as the surviving spouse in the qualified domestic relations order. However, as a cautionary measure, it is recommended the trial court set out a statement in the proposed qualified domestic relations order that the former spouse "be treated as the surviving spouse pursuant to the provisions of 26 U.S.C. § 414(p)(5) up to the amounts designated in the qualified domestic relations order."

Ailleen's next contention is that the trial court erred in setting Thomas' child support obligation at $162.81 per month. She argues the trial court abused its discretion by computing Thomas' child support obligation based on his unemployment income instead of imputing his former annual income of $50,000 as the basis for his child support obligation.

Thomas contends the trial court correctly determined the child support based on his unemployment income because adequate evidence was provided at trial to show he was not deliberately unemployed. He asserts that to do as Ailleen wishes would require this court to reweigh the evidence that was before the trial court.

When reviewing questions of child support, the standard of review is abuse of discretion. *In re Marriage of Schletzbaum,* 15 Kan. App. 2d 504, 505, 809 P.2d 1251 (1991).

A review of the trial court's memorandum decision and the journal entry of July 22, 1991, reveals the trial court adopted respondent's trial exhibit 6 (child support worksheet) in figuring the amount of child support. That exhibit shows respondent's income to be $888 per month.

Under the Kansas Child Support Guidelines (Administrative Order No. 75 [1991 Kan. Ct. R. Annot. 63, 66]), income may be imputed to the noncustodial parent where it is found that parent is deliberately unemployed or underemployed. At trial, evidence was presented that Thomas had been unemployed since November of 1989. At the time of trial, Thomas was receiving $888 per month in unemployment benefits. Thomas was 43 years old with two years of college. During the years of marriage, he worked for K-N Energy, Inc., working his way up the corporate ladder to his former position, which paid $50,000 per year. Both parties testified that part of the reason Thomas was terminated from his employment with K-N Energy, Inc., was the marital problems which occurred at a time when the company asked Thomas to relocate and Ailleen refused to move. Thereafter, while Thomas stayed where he was trying to work things out in his marriage, the company decided to terminate him. By the time of trial, Thomas had made over 40 applications seeking similar type work and pay. About 18 to 20 of those applications were for positions in other states. He presented evidence of the fierce competition for jobs in his skill area, noting that a position he applied for with Farm Bureau had over 150 applicants, another with Northwest Kansas Electric Cooperative had over 40 applicants, and another position in Nebraska had over 200 applicants. Thomas hired a Denver, Colorado, placement firm to help him assess his situation, strengths, and desires to enable him to find a company he could be successful with. He expressed his hopes that he could find substantially similar employment, as before, in the near future.

Considering the foregoing facts of record, a reasonable person could find, as the trial court did, that Thomas was not deliberately unemployed or underemployed, and, accordingly, no error is found in the trial court's failure to impute his former income to him in figuring the child support obligation.

Ailleen's final contention on appeal is that the trial court erred in ordering an abatement of child support payments when the child is with Thomas for periods longer than two weeks. She refers to part V, section E of the child support guidelines, arguing that the trial court had to document any abatements on the child support worksheet and that the abatement could not reduce the child support paid to her to less than 33% of the combined total child support.

Thomas counters that it was not error for the trial court to provide for an abatement in child support for times when and if the child's visitation lasts longer than two weeks in a given month. He asserts such a provision is not in violation of the child support guidelines, and because such an abatement would not be a monthly occurrence, it need not be reflected on the worksheet as an adjustment in the monthly support obligation.

In referring to section E, child support adjustments, this court has held, pursuant to Kansas Supreme Court Administrative Order No. 75, that the trial court must "make written findings *or specific findings on the record,* which shall be included in the journal entry, as to the reasons for any deviation from the Net Parental Child Support Obligation on Line D.9." (Emphasis added.) *In re Marriage of Schletzbaum,* 15 Kan. App. 2d at 507. In its memorandum decision of September 4, 1991, journalized October 9, 1991, the trial court made specific findings that its method of reduction in child support, *i.e.,* the abatement, "is a scheme designed to allow the child some part in the decision making process for extending summer visitation but still allow the respondent a reduction *so that he may afford to keep the child."* (Emphasis added.) Accordingly, there was no error.

The trial court's finding that an abatement of two-thirds of the monthly support ordered would not violate the guidelines because it does not fall below one-third of the monthly support obligation ordered is also correct. The guidelines provide that the reduction shall not leave the custodial parent with less than 33% of the *combined total child support obligation.* Here, the child support worksheet shows the combined total child support to be $392. One-third of the combined total is $130.67. The trial court assigned $229.19 of the combined total child support obligation to Ailleen. Therefore, until such time as child support is modified,

the amount "left" with Ailleen is always going to be more than one-third of the combined total child support obligation. There was no error on the part of the trial court.

Thomas, in his cross-appeal, first contends the trial court erred by not properly considering the nine factors identified by Kansas statute in determining maintenance. He contends the trial court improperly considered the fact that the minor child was entering an expensive phase of life as one of the factors.

Ailleen contends the trial court's decision shows it considered all the relevant factors in making its maintenance determination.

Under K.S.A. 1991 Supp. 60-1610(b)(2), the trial court may award maintenance "in an amount the court finds to be fair, just and equitable under all of the circumstances. The decree may make the future payments modifiable or terminable under circumstances prescribed in the decree."

Whether maintenance is to be allowed must be arrived at by considering certain factors as enumerated in *Williams v. Williams*, 219 Kan. 303, 548 P.2d 794 (1967), and in *Powell v. Powell*, 231 Kan. 456, 460, 648 P.2d 218 (1982), with the exception of fault. See *In re Marriage of Sedbrook*, 16 Kan. App. 2d 668, 675, 827 P.2d 1222 (1992). The factors are: age of the parties; the parties' present and prospective earning capacities; length of marriage; extent of property owned by each party; needs of the respective parties; the time, source, and manner of acquisition of property; family ties and obligations; and the parties' overall financial situation.

At trial, evidence revealed Ailleen was age 42. Ailleen had four years of college, did not work outside the home during marriage, and presently held a job wherein she had a gross monthly income of $1,250. The home she was presently renting, wherein both she and the minor child resided, cost $300 per month to rent and was not comparable to the marital home. She had minimal household furnishings. A shortfall of approximately $217.59 per month existed between her income and expenses. She possessed only basic office skills.

Thomas was age 43. He had two years of college, approximately 20 years' work experience, making as much as $50,000 per year. The parties were married 20 years. Thomas agreed he was capable of obtaining employment at substantially the same salary as be-

fore. Although the marital property was valued at the date of separation, Thomas' assets in the form of his benefit plans with his former employer, which he was allowed to keep, had increased substantially to about $60,000.

The trial court considered that even with the receipt of child support, Ailleen would still have a shortfall of $86.19 per month. It noted that the *totality of the evidence* at trial revealed that Ailleen's needs were more than minimal and that she had limited earning capacity and skills. These findings were incorporated in the journal entry of July 1991. Although it is apparent the trial court weighed the required statutory and judicial factors, in light of the previous holdings herein relating to valuation of marital property, the court should again weigh the various factors and may find it necessary to modify its maintenance award.

Thomas next argues that it was error for the trial court to omit provisions in the order stating that maintenance would terminate on death, remarriage, or cohabitation.

Ailleen contends that it is within the trial court's discretion to make future maintenance payments modifiable or terminable under K.S.A. 1991 Supp. 60-1610(b)(2) and, therefore, it was not error for the trial court to omit provisions terminating the maintenance on death, remarriage, or cohabitation. Should any of those events occur, Thomas could petition the trial court for an order terminating maintenance payments.

Proof of remarriage by the recipient of maintenance and a motion to terminate presents a prima facie case for termination of maintenance, absent proof by the recipient of strong compelling circumstances why the maintenance should not cease. See *Wright v. Wright,* 209 Kan. 628, Syl. ¶ 2, 498 P.2d 80 (1972); *Beck v. Beck,* 208 Kan. 148, Syl., 490 P.2d 628 (1971); and *Herzmark v. Herzmark,* 199 Kan. 48, Syl. ¶¶ 2, 3, 427 P.2d 465 (1967).

Likewise, maintenance will terminate upon the death of the obligor spouse unless the decree or settlement agreement specifically provides in unmistakably clear terms the intent that payments continue after the obligor spouse's death. *In re Estate of Sweeney,* 210 Kan. 216, 224-25, 500 P.2d 56 (1972). So too, because "[t]he basic idea of alimony is that it is an allowance for support; and where it takes the form of stated payments, it is therefore terminated on the death of the dependent spouse, since

the object for which it was granted no longer exists." 24 Am. Jur. 2d, *Divorce and Separation* § 678. See also *Bourman v. Bourman,* 155 Kan. 602, 605-06, 127 P.2d 464 (1942) ("[I]t is generally held that the right to collect alimony payments terminates upon the death of the former wife in cases where the alimony judgment is not for a fixed and unchangeable amount.).

In the recent case of *In re Marriage of Sedbrook,* 16 Kan. App. 2d 668, Syl. ¶¶ 2, 3, the court addressed the issue of cohabitation and termination of maintenance, holding:

"The determination of the allowance of maintenance must be based on a realistic evaluation of the parties' circumstances, future income, and needs."

"A finding of cohabitation may not be equated with the conclusion the relationship has become that of wife and husband and is not, by itself, sufficient to justify denial of spousal maintenance."

In *Sedbrook,* the trial court denied the wife maintenance because she was cohabiting with an unrelated male. 16 Kan. App. 2d at 672. On review, this court found the trial court's denial of maintenance an abuse of discretion because the trial court penalized the wife for marital infidelity instead of looking at the factors under *Powell,* 231 Kan. at 460, and *Williams,* 219 Kan. 303. 16 Kan. App. 2d at 675. The court noted that the wife and her cohabitant did not indicate they considered themselves husband and wife and, in discussing the legal effect of their cohabitation, looked to 1 Elrod, Kansas Family Law Handbook § 10.083 (rev. ed. 1990), stating:

" 'Without a provision in a decree or agreement, most courts have found that cohabiting with another is not by itself a sufficient change of circumstances to justify termination of maintenance. [Citations omitted.] Cohabitation is only one factor to consider in assessing the needs of the recipient. If the recipient is in fact being supported by the cohabitant, there may be a strong case for termination based on need no longer [being] present.' " 16 Kan. App. 2d at 673.

Under *Sedbrook,* for the trial court to automatically provide for termination of support when a maintenance-receiving spouse cohabits with another would be an abuse of discretion, penalizing that spouse's future actions without weighing the necessary statutory and judicial factors. If such cohabitation occurs, the proper procedure would be to petition the court for termination, whereon the trial court can weigh all the necessary factors.

For the foregoing reasons, it was not error for the trial court to fail to include in its decree provisions for the termination of maintenance upon death, remarriage, or cohabitation.

Thomas next argues the trial court erred in assessing the costs of the services by Stephen Blaylock (an attorney), Nolan Luke (a CPA), and Ida Jones (an appraiser) against the equity in the marital home because Ailleen did not provide the trial court with any evidence that the amounts were reasonable. He argues the fees were incurred solely for Ailleen's benefit and unnecessarily so because Ailleen ignored their valuations, eventually asking the trial court to equally divide the assets regardless of their present value.

Ailleen argues it was necessary for her to seek the services of the three individuals in preparation for trial to enable her to better argue the date of valuation and to obtain a fair and just share of contested marital property.

Each party was ordered to pay his or her own attorney fees. However, in its property division, the trial court split the costs of the additional services of Blaylock, Luke, and Jones between the two parties by ordering the marital residence sold and the proceeds applied first to the mortgage; second, to reasonable costs of sale; third, to debts owed to Blaylock, Luke, and Jones; and fourth, one-half of the remainder to each party.

Under K.S.A. 1991 Supp. 60-1610(b)(4), "[c]osts and attorney fees may be awarded to either party as justice and equity require." Attorney fees are traditionally "awarded to a party to enable that person to assert marital rights that might not otherwise be protected." *Dunn v. Dunn,* 3 Kan. App. 2d 347, 350, 595 P.2d 349 (1979). See *St. Clair v. St. Clair,* 211 Kan. 468, Syl. ¶ 7, 507 P.2d 206 (1973); *Wiles v. Wiles,* 200 Kan. 574, Syl. ¶ 1, 438 P.2d 81 (1968).

" 'Pursuant to this statute [K.S.A. 1981 Supp. 60-1610(h) (now K.S.A. 1991 Supp. 60-1610[b][4]), the district court is vested with wide discretion to determine both the amount and the recipient of an allowance of attorney fees. [Citation omitted.] Upon review of an award of attorney fees, the appellate court does not reweigh the testimony or evidence presented nor reassess the credibility of witnesses. [Citation omitted.] The trial judge is considered an expert in determining attorney fees [citation omitted]; and an attorney fee award will not be set aside on appeal *when supported by*

*substantial competent evidence.'* [Citation omitted.]" (Emphasis added.) *Powell v. Powell,* 231 Kan. at 463 (quoting *Dunn,* 3 Kan. App. 2d at 348).

"Services rendered by attorneys which are unrelated to the divorce are not compensable as part of the divorce action." *Scimeca v. Scimeca,* 1 Kan. App. 2d 70, Syl. ¶ 1, 561 P.2d 904 (1977).

At trial, Ailleen testified regarding Luke's valuation of Thomas' defined contribution plans and presented a billing statement in the amount of $350 from Blaylock for those services. In trying to discredit Luke's computations, Thomas presented copies of Luke's letters to Blaylock as evidence of Luke's work performed. Substantial competent evidence exists in the record to support the trial court's finding that Luke performed the services for Ailleen in preparation for trial and that the amount requested was a fair amount.

Ailleen also presented an appraisal by Jones regarding the value of the marital home. Ailleen testified that she had a statement from Jones billing her $250 for the appraisal and requested that Thomas pay all or part of that bill. While the trial transcript reveals the appraisal was admitted at trial as petitioner's exhibit 7, it is not in the record on appeal. No mention is made in the trial transcript concerning whether Ailleen presented a copy of Jones' bill to the trial court for review or whether it was admitted into evidence. In essence, the trial court had only Ailleen's word that Jones billed her $250 for the appraisal.

Ailleen testified her trial counsel had to retain the services of attorney Blaylock to help in the present divorce action. She identified petitioner's exhibit 9 as a statement of her bill from her trial counsel and testified that Blaylock had not sent her a bill. Although petitioner's exhibit 9 was admitted at trial, it is not in the record on appeal. When petitioner's exhibit 9 was admitted at trial, Thomas did not object to the admission of that exhibit to show what was billed.

Without the statements of Jones and Blaylock in the record, it is impossible for this court to determine whether those statements contained substantial competent evidence to support the fees claimed. "A party must designate an adequate record on appeal to substantiate contentions made to the appellate court. Without such a record, claims of alleged error must fail. Assertions

in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal." *Eisenhut v. Steadman,* 13 Kan. App. 2d 220, 223, 767 P.2d 293 (1989). See *In re Marriage of Sadecki,* 250 Kan. 5, 12, 825 P.2d 108 (1992).

The trial record reveals evidence before the court regarding the fees assessed against the equity in the home and their relation to Ailleen's trial preparation. The trial record reveals that some exhibits were admitted at trial regarding the various fees. Thomas has neglected to provide those exhibits pertaining to Blaylock and Jones in the record on appeal. Without those exhibits, it is impossible to determine whether the exhibits were inadequate to form a basis for an award of fees or to show the trial court abused its discretion in assessing one-half the fees against Thomas' equity in the marital home. Accordingly, we find no error.

Thomas' final contention is that the trial court erred when it adopted his settlement proposal and then modified it. In short, Thomas argues that his settlement proposal resulted in an equal division of the marital property and that the trial court erred when it modified the settlement because the result was to assign him a much less than equal division of property.

The Kansas Supreme Court has recently reaffirmed that Kansas does not require the trial court to create a 50/50 split of the marital property. *Sadecki,* 250 Kan. at 13. A review of the journal entry and the figures contained therein reflects a fairly even split, with Ailleen receiving less than one percentage point more than Thomas. It appears the meat of Thomas' argument alleging a greater disparity results from disputes in determining a valuation date and how that date affects the value of his various pensions, an area we have already covered in this opinion and need not discuss further in light of the necessity for the trial court to reweigh the evidence on valuation in accordance with the required valuation date.

Affirmed in part and reversed in part, with directions to the trial court to reweigh the evidence as to property division and maintenance using a valuation date of marital property as of the date of the filing of this divorce action.