(879 P.2d 632)

No. 70,808

In the Matter of the Marriage of SUE ANN CASE n/k/a SUE ANN MILLER, *Appellant*, and CARLTON M. CASE, *Appellee*.

Petition for review denied 255 Kan. 1002 (1994).

Opinion filed July 29, 1994.

*William E. Waters*, of Topeka, for the appellant.

*David A. Hanson*, of Glenn, Cornish, Hanson & Karns, of Topeka, for the appellee.

Before PIERRON, P.J., BRAZIL, J., and DAVID L. THOMPSON, District Judge, assigned.

PIERRON, J.: Sue Ann Miller appeals from an order reducing Carlton M. Case's child support obligation for the parties' two minor children. Miller alleges that the district court abused its discretion when it imputed Case's income at the same level as Miller's for purposes of determining Case's child support obligation.

This court previously considered this case and remanded it for an evidentiary hearing. See *In re Marriage of Case*, 18 Kan. App. 2d 457, 856 P.2d 169 (1993).

Case and Miller were granted a divorce on June 22, 1989. By agreement of the parties, Case was ordered to pay $800 per month child support. Each party was awarded his or her "respective employment benefits, including any savings, retirement, pension,

annuity, insurance and/or stock ownership plans, free and clear of any claims of the other party."

On March 27, 1992, Miller filed a petition to enforce support, alleging that Case had an arrearage of $1,600 in child support payments. An income withholding order was filed on April 20, 1992.

On May 1, 1992, Case filed a motion to reduce child support. Case attached a domestic relations affidavit (DRA) and child support worksheet (CSW). Other issues have been litigated between the parties, but this appeal revolves around Case's motion to reduce child support.

At the time of the filing of this motion, Case owned The Studio, Inc., a photography business. Case and his current wife had filed articles of incorporation for The Studio on January 17, 1992. Case was initially its sole employee.

The amount of Case's actual income is unclear. Case reported varying amounts to the court and to Miller's attorney. Case reported his salary was $800 per month in a letter dated March 19, 1992. Case testified that the $800 per month figure was a "projected" amount which he was not paid. Case stated in one DRA and CSW that his income from The Studio was $515 per month as of April 30, 1992. However, Case testified that he did not begin receiving a salary from The Studio until September 1992. Case reported that his salary was $515 per month in a revised DRA dated August 1993. Case reported a gross annual salary of $2,060 from The Studio on his 1992 income tax return.

Prior to his employment with The Studio, Case was employed with Southwestern Bell (SWB) as a line forecaster, a management position. He worked for SWB for 12 years. Prior to that, Case owned a photography studio and a frame shop and had worked, at different times, as an offset printer, an administrative assistant for Topeka Parks and Recreation, a salesman for a Topeka radio station, and a business manager for the Topeka Housing Authority. Case also did "some photography work on the side" during the time he worked for SWB.

Case's W-2's from SWB show the following gross salaries for the following years:

| | |
|---|---|
| 1991 | $39,524.71 |
| 1990 | 37,419.75 |

| 1989 | 35,836.80 |
| 1988 | 34,141.29 |
| 1987 | 32,548.43 |
| 1986 | 28,712.64 |
| 1985 | 27,002.19 |

In the latter part of 1991, SWB offered an "enhanced management pension plan" to all its managers. This voluntary plan, also known as a "buy out," was available until December 31, 1992. The plan included an additional incentive of $1,756.57 for Case (and managers similarly situated) if he chose to "retire" prior to December 31, 1991. Case accepted the buy-out offer and retired on December 31, 1991. In total, Case received the following amounts as a result of accepting the buy-out offer:

| | | |
|---|---|---|
| Pension (SWB contributions entirely) | Lump sum | $36,110.00 |
| Savings Plan (SWB and Case contributions) | Lump sum | $ 6,314.61 |
| Loan Default (Loan forgiveness) | | $ 3,567.91 |
| Sale of Shares (Distributed under "Employee Stock Ownership Plan" [ESOP]) | Lump sum | $ 2,025.36 |
| 1991 Team Award (Received for work done in 1991) | Lump sum | $ 2,665.00 |
| TOTAL | Gross amount | $50,682.88 |

Case received these amounts between January 1 and May 1, 1992. He testified that some of these benefits were in existence at the time of his divorce from Miller in 1989 and were awarded to him as part of the divorce. He also testified the buy-out money was used for payment of personal debts, tax penalties for early withdrawal of the pension funds, and purchase of a mobile home and land. He also used some of the money to visit relatives in New York and South Dakota and to take a business trip to Colorado. Case testified he had taken out a $15,000 start-up business loan. The record does not indicate whether any of the buy-out money was used to start the photography business.

Case testified that the pension plan buy out was voluntary. However, he also testified there had been articles in the newspapers about SWB's intent to decrease the number of management and nonmanagement employees. Case understood that he would either lose his job or be transferred away from Topeka as part of this reduction in workforce. He believed that involuntary separation would be a possibility. He testified that he was concerned for his job "seniority-wise."

When considering whether to accept the buy-out offer, Case looked around for a line forecaster job. He did not consider line forecaster jobs in any other states in the region, as he wished to remain in the Topeka area where he could be with and visit his children. Case said he had gone through the classified ads in the paper for other job opportunities. He testified he had not submitted any employment applications since leaving SWB. Case said that he believed he had the opportunity to build a photography business in Topeka due to his reputation, his clientele, and his belief that a major Topeka studio would be closing.

Miller, employed as a school teacher, testified that her salary as of May 1992 was $2,096 per month ($25,152 per year). Her salary is not at issue in this appeal.

The trial court completed a CSW and imputed $2,100 ($25,200 per year) to Case as income. The trial court found that there had been a material change in circumstances which warranted a modification in the amount of child support. The change of circumstances was due to Case's termination of employment with SWB and his reduced income through The Studio. The court noted that Case's lump sum payment from SWB was, for the most part, property which was previously awarded to Case during the parties' divorce. Additionally, the court found Case's resignation was voluntary but was done during a time when SWB was reducing numbers of employees. The court found Case did not accept the buy-out offer for purposes of reducing his child support. Although the court noted that it must be suspicious of drastic changes in income by one party, it also took note that "the fact of divorce should not totally limit someone's options." The court noted:

"The fact that you have a child support order . . . can[not] be reasonably construed to say to Mr. Case, 'You must stay at Southwestern Bell until the day they fire you,' or, 'You cannot do other things that may diminish

your income for a period of time.' I think the Court's concern when it addresses these issues has got to be whether or not there is a reasonable level of support that can be provided to the children under the parties' circumstances and that the Court must make provisions for a reasonable level of support."

In deciding what level of income to impute, the court made the following statements:

"The fact is, [Case] no longer has a job at Southwestern Bell. *There is no evidence of what he could earn outside of Bell.* I have handled several cases where child support had to be adjusted in connection with buy outs at both Southwestern Bell and Santa Fe, those being the two most prominent. We may have had others. I know of several cases where so-called management was earning on the other side of $50,000. One, today, is working as a security guard within a block of this building. I guess my point is that Santa Fe and Southwestern Bell are good jobs and the fact that someone makes 40,000 a year there doesn't make it that they could make that out in the real world.

"*There is no evidence on this subject, and I'm not—other than commenting on the lack of evidence as to what Mr. Case could actually do outside of Bell.* The fact that he had the job at Bell and he made some choices certainly are factors that I must consider. Whether or not he's underemployed or not depends upon ultimately how well his photography business does. . . *Again, I have no evidence of what the potential is in the photography business.*

. . . .

"Again, *the court has no evidence of how to impute.* The guidelines say able-bodied people should be able to earn at least minimum wage. I don't think there is any question that Mr. Case is earning substantially more money than minimum wage. . . .

". . . I think the Court will consider what the factors are in connection with a quit, what the capability is to furnish adequate support for the children, whether the children can be provided for, and factors—those type of factors in deciding what an equitable order of child support is. .

". . . [I]f we went with [Case's] actual earnings of $515, we'd have a child support order of $143. If we went with the 40,000 figure, . . . I come out with about $840. Ms. Lindhout [the Administrative Hearing Officer who previously heard this case] . . . imputed half of the prior salary [$1,653], which is over three times his present earnings, approximately twice minimum wage. I think we would note that in addition to his salary, he is given a leased car which he uses primarily for business. On the other hand, the fact is, he does make some personal use. Beyond that, whether or not Mr. Case used good judgment or bad judgment, the fact is that the cash flow,

at least what's been demonstrated here, is coming from his present wife. And she, in effect, is paying a portion of the child support.

"I'm going to impute in this case an equivalent salary to Mr. Case that the former Mrs. Case was making. . . . " (Emphasis added.)

The court ordered Case to pay child support in the amounts of $386 + $5 court trustee's fee payable for the month of June 1992; $328 + $4 court trustee's fee payable for the months of July through December 1992; and $436 + $5 court trustee's fee payable monthly thereafter. The amount varies due to the court's adjustment of child care costs and income tax exemption.

Miller argues that there was no material change in circumstances which required a change in child support obligations. Case's voluntary termination of employment with SWB, coupled with his employment with a new corporation which initially paid him no salary, she argues, was not a material change in circumstances. During early 1992, Miller argues, Case received $51,599.83 in lump sum payments from SWB. Miller argues this lump sum, coupled with a salary of $515 per month from The Studio, actually increased Case's financial resources rather than reduced them.

Further, Miller argues, a voluntary termination of employment which results in a reduction of income is not a material change in circumstances justifying a reduction in child support. Miller argues that because Case is "deliberately underemployed," income should be imputed to him for child support purposes. This imputed income should be based on his potential earnings as shown by his past income.

Case argues there was a material change in circumstances warranting a change in child support. This change of circumstances included his "termination" of employment with SWB, resulting in a decrease of salary to $515 per month. Case alleges he received a total of $42,560.62 in payments which "for the most part" was a property division of the parties' prior divorce and not regular income. Additionally, because this income was not "regularly and periodically received," it could not be considered as income for child support purposes. Case points out that the buy out was a "one time deal" and the money was spent before the motion to reduce child support was filed.

Additionally, Case asserts, he was forced to make a choice which resulted in his change in employment. He states that he was not deliberately unemployed or underemployed. He immediately began his photography business. Additionally, Case argues, the district court did impute income to him, finding that he was capable of earning at the same level as Miller. He contends the reduction in child support was also justified by his lack of bad faith in that he did not deliberately accept the buy-out offer to avoid child support.

When reviewing a trial court's order determining the amount of child support, the standard of review for the appellate court is whether the trial court abused its discretion. *In re Marriage of McPheter*, 15 Kan. App. 2d 47, 48, 803 P.2d 207 (1990). " 'Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.' " *In re Marriage of Schletzbaum*, 15 Kan. App. 2d 504, 505, 809 P.2d 1251 (1991) (quoting *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 [1973]).

A court may change or modify a prior order of child support when there is a material change in circumstances. K.S.A. 1993 Supp. 60-1610(a)(1). The court modifies child support orders to advance the welfare of the child. Kansas Child Support Guidelines, Supreme Court Administrative Order No. 83, § VI (1993 Kan. Ct. R. Annot. 71, 87). Material changes in circumstances include any change in financial circumstances of the parents which would result in a 10% or more decrease or increase and any other changes in circumstances traditionally considered by the courts. Kansas Child Support Guidelines § VI. A. (1993 Kan. Ct. R. Annot. 87). In setting child support, the court shall consider "all relevant factors . . . including the financial resources and needs of both parents." K.S.A. 1993 Supp. 60-1610(a)(1). "What constitutes a material change [in circumstances] depends on the case. . . . Most courts agree that the change should be material, involuntary, and permanent in nature." 1 Elrod, Kansas Family Law Handbook § 14.042B, p. 14-23 (rev. 1990).

Here, the court found that there had been a material change in circumstances. Case was no longer employed with SWB. His

income at The Studio, however unclear as to the amount, was not the same as the income he earned with SWB. Although the court found that the change was voluntary, it did note that the change was made in the face of workforce cutbacks. What is a material change in circumstances is fact specific.

Miller cites a number of cases where the courts have found that a voluntary termination of employment from a higher paying job to take a lower paying job is either not a valid change in circumstances to reduce support or leads to an imputation of income at the previous level, which leads to no reduction in the support order. Miller focuses on *Jamison v. Jamison*, 845 S.W.2d 133 (Mo. App. 1993). There, the trial court had before it a father who accepted a buy out, as he believed he would soon be terminated anyway. The court imputed his previous salary as that which he could earn, notwithstanding the fact that his actual earnings were less.

While the bare facts look similar to the instant case, we must point out that the trial court found the previous income was an appropriate standard to determine the present potential. That does not mean in all instances that will be the case. We also note the factfinder's decision was affirmed by the appellate court, applying the usual standard of review. Here, Miller asks us to find the determination of the factfinder to be unreasonable.

In the instant case, the trial court provided a lengthy analysis of the situation and found that neither Miller's nor Case's proposal was well supported by the evidence. It noted its experience in dealing with similar buy-out situations and rejected the contention that anyone in that situation is presumed to be able to earn as much in a new job.

The discussion by the trial court was well reasoned and supported by substantial evidence as set out in its decisions.

Voluntary termination by a child support obligor from higher paid employment to accept lower paid employment is always suspect. Before such a change in circumstances can be used as a justification to reduce support, the trier of fact must be convinced the termination was for rational and sufficient reasons, and that the obligor cannot in fact obtain appropriate employment at a similar wage.

While, in the instant case, the trier of fact might have found against the obligor, a reasonable weighing of the evidence led him to believe the change of circumstances was justified and similar paying employment was not available. There is no good cause for this court to reverse that finding. A reasonable person could take the view that there had been a material change in circumstances which warranted a modification of child support. See provisions for imputing income in the Kansas Child Support Guidelines § II. E. (1993 Kan. Ct. R. Annot. 73); *In re Marriage of Cray*, 18 Kan. App. 2d 15, 846 P.2d 944 (1993); and *In re Marriage of McNeeley*, 15 Kan. App. 2d 762, 766, 815 P.2d 1125, *rev. denied* 249 Kan. 776 (1991).

The question remains, however, whether the court abused its discretion as to the amount of income imputed to Case.

Miller argues the trial court abused its discretion when it found that Case's buy-out payments were property which had been divided in the couple's prior divorce and should not be considered for purposes of child support. Miller asserts these were assets which must be considered in determining whether there had been a material change in circumstances and cites *Kuronen v. Kuronen*, 499 N.W.2d 51 (Minn. App. 1993), in support of her argument.

Case replies that the court did not exclude the lump sum payments from consideration. Rather, the court noted this money, for the most part, was part of the property division bargained for in the previous divorce. The court merely distinguished the money as separate from current regular earnings. Case argues that because these were funds from a prior property settlement, they were not regular earnings and the court treated them correctly. We agree.

Monies obtained from the sale or liquidation of assets awarded a party in a divorce will usually not be considered current regular earnings for purposes of determining child support obligations.

The divorce decree awarded each party his or her "respective employment benefits, including any savings, retirement, pension, annuity, insurance and/or stock ownership plans, free and clear of any claims of the other party." It is not clear from the record that the trial court completely disregarded these funds in its consideration of Case's imputed income. The trial court did note that the buy-out money was "bargained for in the Divorce De-

cree.. . . . [I]n terms of the posture of this case, it was a property item as opposed to an income item, . . . other than the small amount that would have been added to his benefit after the divorce. Arguably, those amounts could be called income."

The guidelines define "Domestic Gross Income" as "income from all sources." The court may also consider "historical information" in computing income. Additionally, non-wage income "includes all income which is regularly and periodically received from any source." Kansas Child Support Guidelines § II. D. (1993 Kan. Ct. R. Annot. 73). Domestic gross income includes "every conceivable form of income, whether it be in the form of earnings, royalties, bonuses, dividends, interest, maintenance, rent, or whatever." *In re Marriage of McPheter*, 15 Kan. App. 2d at 48 (quoting 1 Elrod, Kansas Family Law Handbook § 14.024, p. 14-11 [rev. 1990]). In *McPheter*, this court held that income from a job that was "iffy" should be included as income if it was relied upon by the parties prior to the divorce. 15 Kan. App. 2d at 49-50.

*Kuronen*, the case cited by Miller in support of her argument, is distinguishable from the facts of this case. The holding in *Kuronen* was dependent on a Minnesota statute which required that the courts consider "all earnings, income, and resources of the parents, including real and personal property" when setting or modifying child support. 499 N.W.2d at 53. Kansas courts are to consider all income from whatever sources and are not statutorily required to consider real and personal property.

Here, the lump sum payments received by Case were one-time buy-out payments. The money received was not relied upon by the parties during the prior marriage. In fact, any potential money received from these sources was bargained away during the property settlement. The trial court could reasonably conclude that the lump sum payments should not be included as domestic gross income when figuring child support.

Given the nature of the evidence presented to the court, the income level imputed to Case was not unreasonable, although different income levels could also be justified. The decision was not arbitrary or fanciful.

Affirmed.